UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| MARK WIGHTMAN, D.D.S., et al. | CIVIL ACTION |
|---|---|
| VERSUS | No.: 19-11628 |
| AMERITAS LIFE INSURANCE CORP. AND DENTEMAX, L.L.C. | SECTION: "J" (3) |

## ORDER & REASONS

Before the Court are two *Motions to Dismiss for Failure to State a Claim* **(Rec. Docs. 8 and 11)** filed by Ameritas Life Insurance Corporation ("Ameritas") and Dentemax, L.L.C. ("Dentemax"), defendants in this matter.[1] Mark Wightman, Courtney Wightman, and Wightman Family Dental L.L.C. ("Plaintiffs") have filed an omnibus opposition thereto (Rec. Doc. 23). Both defendants have supplemented their motions with replies. Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds both motions should be **GRANTED** in part and **DENIED** in part.

## FACTS AND PROCEDURAL BACKGROUND

Plaintiffs are dentists who operate their family dentistry, Wightman Family Dental, L.L.C., in St. Bernard Parish.[2] At some point prior to 2012, Plaintiffs entered into a preferred provider organization ("PPO") agreement with Dentemax. A PPO is defined as a "contractual agreement or agreements between a provider or providers

---

[1] Ameritas filed its Motion to Dismiss in (Rec. Doc. 8) and Dentemax filed its Motion to Dismiss in (Rec. Doc. 11).
[2] All facts are taken from Plaintiffs complaint. (Rec. Doc. 1).

and a group purchaser or purchasers to provide for alternative rates of payment specified in advance for a defined period of time in which the provider agrees to accept these alternative rates of payment offered by the group purchasers to their members whenever a member chooses to use its services." La. R.S. 40:2202(5)(a). Plaintiffs stated goal in entering the PPO was to expand their client base via access to Dentemax's network.

On May 1, 2012, Ameritas "leased" the Dentemax PPO network, which granted Ameritas access to the reduced PPO reimbursement rate Plaintiffs had provided Dentemax. Plaintiffs were not notified of this arrangement, nor were Ameritas's benefit cards updated to reflect this change. Thus, when Ameritas's insureds presented their benefit cards to Plaintiffs, Plaintiffs believed they would be reimbursed at their standard rates.[3]

Upon discovering Ameritas intended to reimburse them at a reduced rate, Plaintiffs reached out to Ameritas and learned about the leasing arrangement between Ameritas and Dentemax. After Ameritas and Dentemax denied Plaintiffs' request to reimburse Plaintiffs at Plaintiffs' standard rate, Plaintiffs initiated the present suit. The gravamen of Plaintiffs complaint is Defendants' purported violation of La. R.S. 40:2203.1, which requires PPOs to notify health care providers when using reduced rates. The 40:2203.1 amendment, passed by the legislature in 1999, is itself an amendment to the PPO Act, which authorized health care providers and insurance companies to enter into PPOs. *See* La. R.S. 40:2201.

---

[3] The standard rate is the rate Ameritas's benefit cards advertised, which was the rate Plaintiffs were used to before Ameritas entered into the leasing arrangement with Dentemax.

Although both Defendants seek dismissal of Plaintiffs' claims pursuant to Rule 12(b)(6), they do so on relatively different grounds. Therefore, the Court will address each Defendant's request for dismissal separately.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (internal citations omitted). The allegations "must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).

"Under Rule 12(b)(6), a claim may be dismissed when a plaintiff fails to allege any set of facts in support of his claim which would entitle him to relief." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 561 (5th Cir. 1998)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). The court is not, however, bound to accept as true

legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678. "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor*, 296 F.3d at 378.

When determining an issue of Louisiana law, the Court should first look to the decisions of the Louisiana Supreme Court. *Howe ex rel. Howe v. Scottsdale Ins. Co*, 204 F.3d 624, 627 (5th. Cir. 2000). As the Louisiana Supreme Court has not directly addressed any of the Louisiana legal issues raised by the parties, it is necessary for the Court to discuss the level of deference this Court owes to Louisiana Courts of Appeal. *See Labiche v. Legal Sec. Life Ins. Co.*, 31 F. 3d 350, 351 (5th. Cir. 1994) (holding that when interpreting an issue of Louisiana law, federal courts should first look to the decisions of the Louisiana Supreme Court). "In the absence of a ruling from the state's highest court, this Court may look to the decisions of intermediate appellate state courts for guidance." *Howe ex rel. Howe.*, 204 F.3d at 627. In Louisiana, interpretations of law by intermediate appellate courts are not to be disregarded by a federal court unless there exists other persuasive data that the Louisiana Supreme court would decide otherwise. *Labiche*, 31 F. 3d at 351 (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465(1967)).

## DISCUSSION

### I. WHETHER LA. R.S. 40:2203.1 APPLIES TO DENTAL PROVIDERS

Before addressing the individual defenses of Ameritas and Dentemax ("Defendants"), the Court must answer the antecedent question of whether La. R.S. 40:2203.1 applies to dentists. La. R.S. 40:2203.1(A), the application provision in the

amendment, states that "the requirements of this Section shall apply to all preferred provider organization agreements that are applicable to *medical* services." Defendants argue that dentists and dental services are excluded from this definition, and thus all of La. R.S. 40:2203.1, including the notice requirements, is inapplicable to this case. The Court disagrees.

Defendants put forward several arguments in support of their position. First, Defendants argue that 40:2203.1 is punitive in nature and inhibits the freedom to contract, and thus must be construed narrowly. *See Rodriguez v. Louisiana Med. Mut. Ins. Co.* 618 So.2d 390, 394 (La. 05/24/93). ("[A] statute in derogation of common or natural rights is to be strictly construed"); *see also Katie Realty v. La. Citizens Prop. Ins. Corp.*, 2012-0588 (La. 10/16/12) 100 So. 3d 324, 328 ("[S]tatutes that are penal in nature must be strictly construed").

However, the entirety of La. R.S. 40:2203.1 is not punitive. Rather, it is only Subsection G which is penal in nature. *See Indian Harbor Ins. Co. v. Bestcomp, Inc.*, No. 09-7327 2010 WL 5471005 (E.D. La. Nov. 2010) ("the Court also finds it significant that numerous courts have referred to the damages under section 40.2203.1(G) as punitive."). Additionally, 40:2203.1 does not prohibit Defendants from entering into any type of contract they so desire. The only requirement of 40:2203.1 is that the health care provider receive notice of the alternative rate of payment created by the contract in order for the contract to be enforceable against that health care provider. Defendants' argument is akin to reasoning that Louisiana's Public Records doctrine is a restriction on the right to contract because third parties

have to be put on notice in order for the contracts to be enforceable. Thus, the Court does not find it needs to construe 40:2203.1 particularly narrowly.

Second, Defendants urge the Court not to be the first "to judicially expand the scope of this statute decades after enactment." (Rec. Doc. 8 at 12). The question before the Court is the precise scope of the statute, namely if the notice requirements of 40:2203.1 apply to dentists and dental services. The use of the term "expand" is misleading, as no court has previously addressed this issue. In fact, Defendants have not presented, nor has the Court's independent research revealed, any case analyzing in depth the scope of 40:2203.1. Thus, there is no core precedent surrounding this issue from which the Court can "expand."

Third, Defendants attempt to argue the entire PPO Act is inapplicable to dentists by highlighting the definition of health care provider found in La. R.S. 40:2202.1(6)(A),[4] which states, "Provider shall mean one or more entities which offer health care services and *shall include but not be limited* to hospitals, individuals, or group of physicians, individuals or groups of psychologists, nurse midwives, ambulance service companies, and other health care entities." (emphasis added). Defendants attempt to make the rather incredulous argument that the Court should apply the interpretive method of *expressio unius est exclusio alterius*[5] to the statute, and thereby find that it does not apply to dentistry because dentistry is not explicitly enumerated in the statute. The Court declines to do so, considering the language of

---

[4] This statute defines the term health care provider for purposes of the entire PPO Act. In essence, Defendants are attempting here to argue that the entire PPO Act is inapplicable to dentists. Only in the alternative do they posit that 40:2203.1, the amendment to the PPO Act, in particular is inapposite to dentists.

[5] The inclusion of one means the exclusion of the other.

the statute, "shall include but not be limited to," is quite clearly illustrative as opposed to exclusive. *See Pumphrey v. City of New Orleans*, 2005-0979 (La. 4/4/06) ("A court must give effect to the literal application of a statute, including its grammatical construction.") 925 So. 2d 1202, 1211. Moreover, the Court notes the inconsistency of Defendants arguing that their own business arrangement, entering into PPO agreements with a dental service provider, has in fact been unauthorized under the PPO Act this entire time.

Because the list in 2202.1(6)(A) is illustrative and not exhaustive, the proper method of statutory interpretation is *ejusdem generis*. Utilizing the rule of *ejusdem generis*, the general phrase "other health care entities" should be applied to "classes of things of the same general kind as those specifically enumerated." *Id.* at 1212. Put more simply, dentists should be considered health care providers if they are of the same general kind as physicians, nurse midwives, psychologists, and ambulance service companies. *See* La. R.S. 40:2202.1(6)(A).

Dentistry is the "evaluation, diagnosis, prevention, or treatment, including nonsurgical, surgical, or related procedures, of disease, disorders, or conditions of the oral cavity, maxillofacial areas or the adjacent and associated structures and their effect on the human body." 37:751(A)(1). Dentists "may administer general and local anesthetics and prescribe drugs or medicines necessary or proper in the[ir] practice." La. R.S. 37:751(A)(1). A dentist must obtain an advanced degree and maintain a license to practice. La. R.S. 37:751. Thus, a dentist shares key characteristics with the enumerated group. The Court finds no appreciable difference between

psychologists and nurse midwives specializing in mental and female reproductive health respectively, and dentists specializing in maxillofacial health. Therefore, a straightforward analysis of the statutory language of 40:2201.1(6)(A) necessitates a conclusion that dentists are health care providers.

The Court's conclusion is further buttressed by an advisory opinion authored by the Office of the Attorney General, which explicitly states that dentists are to be considered "providers" under 40:2201.1(6)(A), despite not being expressly included in the enumerated list. *See* La. Atty. Gen. Op. No. 94-313 (La. A.G. 1994), 1994 WL 553063. Additionally, Louisiana courts have already recognized that providers of chiropractic care, a form of health care not expressly articulated in 2201.1(6)(A), can avail themselves of the PPO statute. *Gunderson v. F.A. Richard & Assocs.*, 2009-1498 (La. App. 3 Cir. 6/30/10) 44 So. 3d. 779. One of the plaintiffs in *Gunderson* was Beutler-England Chiropractic Clinic. *Id.* at 782. Defendants correctly point out that the *Gunderson* court's listing of Beutler-England Chiropractic Clinic as a plaintiff is the extent of the *Gunderson* court's discussion of the issue. Nevertheless, the mere recognition of a chiropractic clinic as a valid health care provider under the PPO Act is sufficient to convince this Court that it is correct in its of reading 40:2201.1(6)(A). Namely, that the indisputably broad language was intended to include all manner of specialists and providers in the health care profession, including dentists and chiropractors.

Finally, the Court addresses Defendants' argument that the legislature's use of the term "medical services" in 40:2203.1(A) compared to "health care services" in

the definition of health care provider was intended to exclude dentists from the ambit of 40:2203.1. *See* 40:2202.1(6)(A). Fundamentally, Defendants' urge the Court to avoid reading "medical services" as a synonym for "healthcare services," as doing so would render the change in terminology superfluous. In support of their contention, Defendants rely heavily on the proposition that 2203.1's enactment in 1999, five years after the rest of the PPO Act, renders the Attorney General's 1994 Opinion on the inclusion of dentists in the PPO Act inapplicable to a determination on the inclusion of dentists as providers of medical services under the 2203.1 amendment. Defendants further cite several Louisiana statutes that regulate "medical treatment" distinctly from the practice of dentistry. *See*, e.g. La. R.S. 37:21.1, 37:751, and 37:1263.

To counter, Plaintiffs highlight a definition of "medical services" found in the Louisiana Discount Medical Plan ("LDMA"), which states "[m]edical Services shall mean any care, service, or treatment of illness or dysfunction of, or injury to, the human body, including but not limited to physician care, inpatient care……. ambulance services, chiropractic services, dental services….and medical equipment and supplies." La. R.S. 22:1620.2. Plaintiffs further stress the *Gunderson* court's acceptance of a chiropractic clinic as a viable plaintiff under 40:2203.1, thereby implicitly deeming chiropractic services equivalent to medical services for purposes of 40:2203.1. Many of the statutes cited by Defendants that draw distinctions between dentists and physicians make similar distinctions between physicians and chiropractors. *See* La. R.S. 37:2801 (regulating chiropractors separately from physicians, surgeons, and midwives). Thus, the Third Circuit's implicit recognition of

chiropractic services as medical services is strong support for Plaintiffs' contention that dental services constitute medical services. *See Gunderson*, 44 So. 3d at 779.

Because defining the term "medical services" requires this Court to interpret Louisiana legislation, the primary search is for legislative intent. *Pierce Foundations, Inc. v. Jaroy Const., Inc.*, 2015-0785 (La. 5/3/16) 190 So. 3d. 298, 303. When interpreting legislation, "all laws pertaining to the same subject matter must be interpreted in *pari materia*, or in reference to each other." *Id.* If a statute is ambiguous, a statute "must be interpreted as having the meaning that best conforms to the purpose of the law. Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." *Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev.*, 10–0193, p. 10 (La.1/19/11), 56 So. 3d 181, 187–88. Utilizing these secondary rules of statutory interpretation, the Court finds that dental services fall within the ambit of medical services in 40:2203.1.

First, the Court is persuaded by the similarities between the MDPA and the PPO Act. Both statutory regimes regulate the complex interplay between health care providers, insurance companies, and patients. It is logical to conclude the legislature had similar balancing of interests and policy goals in mind when authoring both regimes. This is supported by the definition of health care provider in the MDPA, which mirrors the definition of health care provider in the PPO Act.[6] The same broad

---

[6] For comparison, the full text of the PPO Act's definition of health care provider reads, "Provider shall mean one or more entities which offer health care services and shall include but not be limited to hospitals, individuals, or groups of physicians, individuals or groups of psychologists, nurse midwives, ambulance service companies, and other health care entities." The full text of the MDPA's definition of health care provider reads, "Health care provider shall mean

language of "including but not limited to" is used in both statutes, but whereas in the PPO Act the illustrative examples are "psychologists, nurse midwives, and ambulatory services," the illustrative list in the MDPA is "chiropractors, pharmacies, and dentists." *See* La. R.S. 22:1260.2(9) and La. R.S. 40:2202.1(6)(A).

Defendants would have the Court conclude the legislature is arbitrarily cherry-picking certain medical specialties to be subject to different aspects of insurance regulation, despite providing no appreciable reason the legislature would do so. Not only is there no discernable reason the legislature would intend such a result, but the resulting confusion resulting from such application of insurance statutes would lead to absurd consequences.

Furthermore, the legislature defined "medical services" as broadly as possible in the MDPA, to include any "care, service, or treatment of illness or dysfunction of, or injury to, the human body." La. R.S. 22:1260.2(13). Not only are dental services included in the definition, but so are substance abuse services, laboratory services, medical equipment and supplies, audiology services, and vision services. *See Id.* Under the doctrine of in *pari materia* the term medical services in the PPO Act should be interpreted using the definition in the MDPA as a reference point. Not only do the two statutory regimes concern the same subject matter, but the definition of medical services in the MDPA is the only formal definition of the term medical services contained in the revised statutes.

---

any person licensed, certified, or registered in this state to provide health care services, including but not limited to physicians, hospitals, home health agencies, chiropractors, pharmacies and dentists."

Defendants' supporting statutes do not include a definition of medical services or dental services. *See* La. R.S. 37:2801 and 37:751. Rather, Defendants rely almost exclusively on various Title 37 statutes that regulate the licensing and behavior of dentists and physicians separately and obliquely refer to them as separate professions. In comparison to insurance regulation, it is easy to understand why the legislature drew distinctions between dentistry and physicians as regards licensing and professional regulation.[7] The calculus involved and policy goals sought are substantially different than in the insurance realm. Put another way, there are clear reasons for the legislature to distinguish between dentists and physicians in regulation and licensing statutory regimes, but the Court finds no clear reasons, and none are proffered by Defendants, as to why the legislature would intend to treat dentists and physicians differently when regulating the two professions' relationships with insurance companies. Thus, the Court finds the MDPA to be more applicable to the interpretation of the statutes at issue than the Title 37 provisions.[8]

Next, the Court turns to the legislative history surrounding the passage of 40:2203.1, the prohibitory amendment to the PPO. *See Pierce Foundations,* 190 So. 3d at 303-04. The legislative history gives no indication the drafters of 40:2203.1 intended the term medical services to be restrictive. (Rec. Doc. 34-2, 34-3, 34-4).

---

[7] The education required is the most obvious example.

[8] Defendants argue, a contrario, that the inclusion of dental services in the MDPA definition is proof that the legislature knows how include dental services in its definition of medical services, and thus not doing so in the PPO Act should be deemed intentional. Once again, however, Defendants miss the mark. The PPO Act does not define medical services and merely not mention dental services. Rather, it does not define medical services at all. By Defendants' logic, all services listed in 22:2160.2 (13) but not in the PPO Amendment were intended to be excluded from the PPO Amendment's ambit, including "inpatient care, outpatient care, hospital surgical services, emergency services, ambulance services, chiropractic services, dental services, audiology services, vision care services, mental health services, substance abuse services, and podiatric care services." La. R.S. 22:2160.2 (13). Defendants confuse different definition with no definition.

Indeed, there is no indication the drafters placed any particular significance on the use of the term medical as opposed to health care services. *See Id.* On the contrary, the evidence shows the drafters considered the scope of the PPO Act's application but chose only to broaden its scope with the addition of "nurse midwives" to the illustrative list of health care providers in 40:2202.1(6)(A). *Id.* Additionally, it must be presumed the drafters had knowledge of the Attorney General's Opinion expressly stating the PPO Act was intended to apply dentists, and yet they chose not to mention dentists at all under the 40:2203.1 amendment or restrict the broad language defining health providers under the PPO Act. *Id.* Furthermore, La. R.S. 2203, the PPO authorization statute, uses the term "medical services" as well. This undercuts Defendants' contention that the legislature intended the use of "medical services" to have a legally-significant restrictive meaning in the 40:2203.1 amendment. The Court finds the legislative history of 40:2203.1 evinces that the legislature implicitly adopted the 1994 Attorney General's Opinion by not refuting it during passage.

Finally, the Court finds that interpreting 40:2203.1 to include dentists and dental services comports with the purpose of the amendment, which is to support "a strong public policy in favor of notice to health care providers that a PPO discount may be taken." *Gunderson*, 44 So. 3d, at 783. Clearly, requiring PPOs to notify dentists that a PPO discount may be taken furthers that policy. In a broader sense though, the 40:2203.1 amendment must be "examined in the context in which it occurs." *Pierce Foundations, Inc.,* 190 So. 3d at 303. The 40:2203.1 amendment prohibiting certain practices by PPOs was enacted in response to issues created by

the PPO Act. *See* La. R.S. 42:2201. Thus, the broader purpose of 40:2203.1 was to amend the way PPOs operated pursuant to the general PPO Act. There is no reason apparent to the Court, evident from the legislative history, or proffered by Defendants that PPOs should be immune from the requirements of the 40:2203.1 amendment when interacting with dentists but not with any other branch of medicine.

Accordingly, the Court finds that the provisions 40:2203.1 apply to dental service providers.[9]

## II.   PLAINTIFFS' CLAIMS AGAINST AMERITAS

Having answered the antecedent question in the affirmative, the Court identifies three separate claims Plaintiffs bring against Ameritas in the present action. First, Plaintiffs claim they are entitled to the statutory damages found in La. R.S. 40:2203.1(G). Second, Plaintiffs argue that even if the specific penalty provision of Subsection (G) is not applicable to Ameritas, they are still entitled to compensation for the difference between the standard billing rate and the reduced rate of the Dentemax PPO. Finally, Plaintiff argues for injunctive and declaratory relief prohibiting Ameritas from continuing to engage in the billing and reimbursement practices at issue.

### A. Plaintiff's Claims Under L.A. R.S. 40:2203.1(G)

---

[9] At the risk of redundancy, the Court once again notes that Louisiana's Third Circuit Court of Appeal reached essentially the same conclusion in Gunderson. A chiropractor attempting to avail themselves of 40:2203.1 is in a virtually indistinguishable position from a dentist for the purposes of Defendants' arguments. Indeed, as Plaintiffs correctly point out, a dentist is more akin to a prototypical physician by almost any metric. "[C]hiropractors, unlike dentists, cannot prescribe medicine, administer drugs, or install prosthetic devices." (Rec. Doc. 23 at p. 6). Additionally, chiropractors did not have an Attorney General Opinion specifically stating that 2203 was undoubtedly intended to apply them. Thus, a fortiori, dentists must be viable plaintiffs under 40:2203.1.

Ameritas's first argument in support of dismissal is that Plaintiffs have failed to allege facts supporting a claim that Ameritas is a group purchaser within the meaning of La. R.S. 40:2203.1(G). The Court agrees.

As background, La. R.S. 40:2203.1(G) states, in relevant part, that "[f]ailure to comply with the provisions of Subsection A, B, C, D, or F of this Section *shall subject a group purchaser* to damages payable to the provider of double the fair market value of services provide. . .together with attorney fees to be determined by the court." *Id.* (emphasis added). Plaintiffs allege that Ameritas violated Subsection B, which requires group purchasers to fulfill certain notice requirements when entering into PPOs. Ameritas does not contest, in the present motion at least, its alleged violation of Subsection B's notice requirements.

The definition of group purchaser is found in La. R.S. 40:2202(3). "Group purchaser *shall mean an organization or entity which contracts* with providers for the purposes of establishing a preferred provider organization." La. R.S. 40:2202(3) (emphasis added). Thus, for the Court to consider Ameritas a "group purchaser" there must be facts alleged showing that Ameritas contracted with Plaintiffs. Plaintiffs have alleged no such facts. Rather, Plaintiffs' complaint reflects an arrangement where Plaintiffs contracted solely with Dentemax, who then in turn entered into a contract with Ameritas.

Nonetheless, Plaintiffs oppose Ameritas's motion to dismiss on the grounds that the correct interpretation of La. R.S. 40:2202(3) does not require an entity to contract directly with the health care provider at issue in the litigation. Instead,

Plaintiff proposes the statute be read to mean that as long as Ameritas has contracted with any health care provider, even one not remotely related to the present dispute, then Ameritas is a "group purchaser" for purposes of Plaintiffs' claims under Subsection G. (Rec. Doc. 23).

Fortunately, this is issue is not one of first impression. In *Touro Infirmary v. American Maritime Officer*, the Louisiana Fourth Circuit Court of Appeal addressed this precise question. 24 So. 3d 948, 2009-0697 (La. App. 4 Cir. 11/9/09). In *Touro*, the court dismissed claims by a provider against entities in the identical position as Ameritas, holding that only "the party who contracts with the provider is the group purchaser." *Id.* at 955. Crucially, the *Touro* court analyzed the term "provider" as contemplated in both La. R.S. 40:2202(3) and La. R.S. 40:2203.1(G) and determined that it refers to the "provider involved in this litigation." *Id.* In other words, there must be privity of contract between the provider seeking Subsection G damages and the entity against whom they are seeking Subsection G damages. *Id.* The reasoning in *Touro* persuades the Court, and thus the Court finds that Plaintiffs have failed to state a claim for recovery against Ameritas under Subsection G.

Plaintiff makes an additional argument that as a result of the leasing arrangement between Ameritas and Dentemax, Ameritas now "stands in the shoes of Dentemax." (Rec. Doc. 23 at 15). The *Touro* court rejected a similar argument by the plaintiff that the contract between the Ameritas-positioned entities and the PPO to use the reduced rate established a mandate "such that it conferred a direct contractual relationship" between the provider and the Ameritas-positioned entities.

*Id.* Thus, the Court finds that Plaintiffs have failed to state a claim against Ameritas under La. R.S. 40:2203.1(G).

## B. Plaintiffs' Claims for Compensation

In the event the Court finds, as it did, that Plaintiffs have not properly stated a claim under Subsection G, Plaintiffs argue in the alternative that Ameritas is still liable for the difference between the standard rate, that is the rate advertised on Ameritas's benefit cards, and the reduced rate Ameritas believes it is entitled to via its arrangement with Dentemax.

La. R.S. 40:2203.1(B) states that a "preferred provider organization's alternative rates of payment shall not be enforceable or binding upon any provider unless such organization is clearly identified on the benefit card issued by the group purchaser." Crucially, Subsection B shifts the focus from penalizing the insurance provider to protecting the health care provider. Thus, even though Ameritas is not liable under the punitive provisions of Subsection G, its arrangement with Dentemax is not enforceable on Plaintiffs if the notice requirements are not followed. Ameritas argues that although this may be an accurate interpretation of the statute, there is no legal theory for Plaintiffs to recover the compensation they seek. The only two avenues of recovery, according to Ameritas, are an affirmative grant of damages under the statute or breach of contract damages. As the statute does not affirmatively provide for this type of compensation, and because Plaintiffs have not plead facts indicating a contractual relationship between themselves and Ameritas, Ameritas contends they cannot be forced to reimburse Plaintiffs at the standard rate.

There are two fatal flaws to Ameritas's position. First, Ameritas ignores the well-established principle of unjust enrichment, codified in Louisiana in Article 2298 of the Louisiana Civil Code.[10] Article 2298 codified long-standing Louisiana jurisprudence "that had imported the theory of *action de in rem verso*." Nikolaos A. Davrados, *Demystifying Enrichment Without Cause*, 78 La. L. Rev. (2018). While the Court takes no position on the ultimate success of an unjust enrichment claim, particularly in light of the parties' lack of in-depth briefing on the issue, the Court notes that a claim for unjust enrichment, if successful, would entitle Plaintiff to the compensation they seek despite the absence of contractual privity.

Second, Ameritas relies heavily on the *Touro* decision to support its position that it is not liable under Subsection G. However, the *Touro* court further held that the plaintiff *had* stated "a cause of action against [defendants] for the difference between the discounted 'alternative rates of payment' and the full standard rate of payment as billed by [plaintiff]." 24, So. 3d. 955. Essentially, the arguments entitling Ameritas to dismissal on the Subsection G claims do not constitute "a convincing case justifying why [it] should be permitted to enforce discounted rates against [Plaintiffs] in the face of [Plaintiffs] factual allegations concerning the benefit cards." *Id.* at 956.

---

[10] Article 2298 reads, "A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.
The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.
The extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time the judgment is rendered." La. C.C. art. 2298.

Not only does the rationale in *Touro* mesh with the existence of quasi-contractual remedies in Louisiana, but it would also be inconsistent for the Court to follow the guidance of the *Touro* court on one statutory interpretation issue, and then go completely against the *Touro* decision on another. It is particularly inconsistent when the two issues, the applicability of the Subsection B and Subsection G of La. R.S. 40:2203.1, are so intertwined. Furthermore, Ameritas suggests a reading of the statute that ultimately renders the notification requirement completely inapplicable to Ameritas and comparable entities. The Court is not convinced the legislature intended the notification requirements to be so ineffective, particularly in light of the "strong public policy in favor of notice to health care providers" that the statute evidences. *Gunderson v. F.A. Richard & Assocs.*, 2009-1498 (La. App. 3 Cir. 6/30/10).

Accordingly, the Court finds that Plaintiffs' allegations asserting their right to reimbursement from Ameritas at the full standard rate are sufficient to state a plausible claim.

## C. Plaintiffs' Claim for Declaratory and Injunctive Relief

In light of the Court's other findings, the only disputed issue left is whether Plaintiffs' claim for declaratory relief is "redundant of the substantive legal claims." *Perry v. H.J. Heinz Co. Brands, LLc,* No. 19-280, 2019 WL 2423231 at 3* (E.D. La. June 10, 2019). Ameritas maintains Plaintiffs' declaratory relief claim is redundant because Plaintiff fails plead any facts indicating prospective relief is necessary. In support of its position, Ameritas points to the portion of Plaintiffs' complaint reading

"[these] actions violate the Petitioners' provider agreements with Dentemax for the period of 2012 through 2016." (Rec. Doc. 1 at 6).

Nevertheless, Plaintiffs also contend that "Defendants continue to engage in unlawful billing and reimbursement attempts as *more fully outlined hereinabove*." (Rec. Doc. 1 at 8) (emphasis added). Although in a vacuum Plaintiffs allegation of current unlawful billing and reimbursement would constitute a mere "legal conclusion," the pleading clearly incorporates by reference the specific actions and procedures that make said billing and reimbursement illegal. Therefore, taken as true and drawing all reasonable inferences in favor of Plaintiffs, they have plead facts indicating prospective relief may be appropriate in this case. *See Lormand*, 565 F.3d 228.

### III.    PLAINTIFFS' CLAIMS AGAINST DENTEMAX

The Court identifies three separate claims Plaintiffs bring against Dentemax in the present action. First, Plaintiffs claim they are entitled to the statutory damages found in the penalty provision of La. R.S. 40:2203.1(G). Second, Plaintiffs claim they are entitled to breach of contract damages from Dentemax. Third, Plaintiffs seek the same declaratory and injunctive relief against Dentemax that they seek against Ameritas. (Rec. Doc. 1).

### A. Plaintiffs' Claims Under 40:2203.1(G)

Although Plaintiffs' claims against Dentemax under 40:2203.1(G) mirror their claims against Ameritas under the same provision, Dentemax's argument on its motion to dismiss is completely separate from Ameritas's. Whereas Ameritas argues

it is not a group purchaser under 40:2203.1(G), Dentemax maintains it falls within the exception clause in 40:2203.1(A), which states, "[t]he provisions of this Section shall not apply to a group purchaser when providing health benefits through its own network or direct provider agreements or to such agreements of a group purchaser." Thus, if the exception in Subsection A applies to Dentemax, then Dentemax cannot be held liable to Plaintiffs under any legal theory for failure to follow the notice requirements of 40:2203.1(B), because the notice requirements would not apply to Dentemax.[11] If, on the other hand, Dentemax is not within the exception laid out in 40:2203.1(A), then it is undisputed Plaintiffs have alleged facts supporting a plausible claim against Dentemax under Subsection G.

Dentemax provides three arguments in support of its position. First, Dentemax asserts that the plain language of 40:2203.1(A) bolsters its contention that the notice requirements do not apply to them, stressing the legislative purpose of curbing rising healthcare costs that was behind the PPO authorization statute. *See* La. R.S. 40:2201. Second, Dentemax cites legislative history it believes indicates the legislature was only concerned with "silent PPOs," as opposed to a PPO possessing a direct contractual relationship with the provider.[12] Finally, Dentemax cites several holdings from the Western District of Louisiana supporting nearly all of its proffered rationales for applying the exemption to them. *See Liberty. Mut. Ins. Co. v. Gunderson,* No. 04-2405, 2006 WL 367700 (W.D. La. Feb 15, 2006); *American Home*

---

[11] Subsection B of 40:2203.1 contains the actual notice requirements that PPOs must follow. A PPO's failure to follow the notice requirements may subject them to liability under the punitive provisions of Subsection G, if the PPO is a group purchaser, or it may simply nullify any reduced rates the PPO is attempting to reimburse the healthcare provider at.

[12] A "silent PPO" is a PPO without direct contractual privity with the health care provider.

*Assur. Co. v. Bernauer*, No. 06-579, 2007 WL 1812573 (W.D. La. June 19, 2007); *CCN Managed Care, Inc. v. Shamieh*, No. 06-519, 2007 WL 2088302 (W.D. La. July 20, 2007). Nevertheless, the Court disagrees and finds the exemption in 40:2203.1(A) inapplicable to Dentemax.

First, the Court does not find the language in 40:2203.1(A) to be unambiguous. The provision could plausibly be read as applying only to PPO networks who directly provide health benefits to patients. It is not clear from the language of the exemption that the legislature intended to exempt PPO's operating purely as middlemen and providing no reimbursement or health benefits of their own. *See Gunderson*, 44 So. 3d. at 787 (holding that the focus is solely on whether the PPO provided benefits directly).

Furthermore, even if the language in 40:2203.1(A) was as unambiguous as Dentemax claims, statutes should be interpreted in a manner that does not lead to absurd or ridiculous consequences. *Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev.*, 56 So. 3d 181, 10-0193 (La. 1/19/11). Instead, "the function of the courts is to interpret the law so as to give them the meaning which the lawmakers obviously intended them to have." *Savoie v. Rubin,* 2001-3275 (La.6/21/02), 820 So.2d 486, 488. The purpose of 40:2203.1 was to "prohibit certain practices by PPOs relative to alternate rates of payment." (Rec. Doc. 34-2). Dentemax's proffered interpretation of the 40:2203.1(A) amendment would completely frustrate that purpose and render the notice requirement virtually meaningless.

On one hand, Dentemax strenuously urges the Court to hold that 40:2203.1, in its entirety, does not apply to PPO's in privity with the relevant health care provider. On the other hand, Ameritas urges the Court to hold that 40:2203.1(G) **only** applies to PPO's in privity with the healthcare provider. Taking those interpretations together, the Court is hard-pressed to think of any situation where 40:2203.1(G) would apply. Considering the Court found Ameritas's position to be correct, the only way to avoid what is practically a complete nullification of Subsection G is to apply the 40:2203.1 amendment in its entirety to Dentemax.

Dentemax, and by reference its supporting cases, misconstrue the purpose of the 40:2203.1 amendment by conflating it with the purpose of the PPO Act writ large. *See Liberty. Mut. Ins. Co.*, 2006 WL 367700 *4 ("The purpose of the PPO statutes is to control the rising costs of providing quality health care benefits."). Yet the amendment to the PPO Act, 40:2203.1, is, by its very nature, designed to *amend* the original statutes. It is true the purpose of the original PPO Act was to control the rising costs of health care, yet the purpose of the 40:2203.1 amendment was to reinforce the need for notification of reduced rates to health care providers. *Gunderson*, 44 So. 3d at 783. The Court finds that in order to best effectuate the intent of the legislature, 40:2203.1 should be interpreted with the policy goals of the 40:2203.1 amendment in mind, not the policy goals behind the initial PPO Act.

This brings the Court to Dentemax's argument that the legislative history of 40:2203.1 shows the legislature intended to exempt all PPO's in direct contract with

a health care provider. (Rec. Doc. 11); *see also Liberty. Mut. Ins. Co.*, 2006 WL 367700 *4.

To be sure, the minutes from the House Committee on Insurance do state that the purpose of the amendment was to "seek to void the use of PPO contracts by parties that are not part of that contract." (Rec. Doc. 34-4 at 3). That statement, however, speaks on the aims of the 40:2203.1 amendment as a whole, and not specifically on the exemption elucidated in Subsection A. Indeed, holding middlemen companies like Dentemax responsible for leasing alternative rates to third-party payors without notice assists in the stated goal.

Rather, the Court finds the statements made by Mr. Greg Frost, a representative of Columbia Health Care Association, to be more instructive as to the legislature's ultimate intent. Mr. Frost "stated that the amendments remove State Group Benefits because they have their own direct contracts and, typically, a labor union health benefit plan will have its own direct contracts. He further stated that the point of the amended version of the bill is to eliminate those who have assembled their own networks." (Rec. Doc. 34-4 at 3).

This commentary confirms that the House Committee on Insurance, which included the exception at issue in 40:2203.1, was primarily concerned with entities that clearly provide health care benefits themselves, such as labor unions and state employee benefit groups. There is no clear-cut evidence showing that the legislature intended for companies operating like Dentemax, i.e. providing no direct health care

benefits themselves and essentially acting as middle men between health care providers and benefits providers, to be privy to the exception.

Finally, the Court's interpretation of 40:2203.1(A) is buttressed by the decision of Louisiana's Third Circuit Court of Appeal in *Gunderson*. 44 So. 3d at 787. The court in *Gunderson* was faced with precisely the scenario present before this Court. First Health, an entity whose business model involved acting as a middleman by establishing a PPO network for third-party payors, was found to be subject to the provisions of 40:2203.1. *Id.* ("In other words, benefits are provided by employers and their insureds with First Health acting as a middleman. The cited provision of the Louisiana PPOA does not apply to entities such as First Health.").

The Court acknowledges that Dentemax has provided case law from another district court that directly conflicts with the position taken by the *Gunderson* court. *See Liberty. Mut. Ins.*, 2006 WL 367700. Nevertheless, because the present question is one of Louisiana law, the Court "will not disregard the decisions of Louisiana's intermediate courts unless [it is] convinced that the Louisiana Supreme Court would decide otherwise." *In re Katrina Canal Breaches Litigation*, 459 F.3d 191, 206 (5th. Cir. 2007). As the discussion of Dentemax's other arguments shows, the Court has not been convinced that the Louisiana Supreme Court would decide the case any differently than the *Gunderson* court.

Accordingly, the Court finds that Plaintiffs have plead sufficient facts to plausibly support a claim for relief against Dentemax under La. R.S. 40:2203.1.

## B. Plaintiffs' Claim for Breach of Contract

Plaintiffs assert they are entitled to breach of contract damages because of Dentemax's breach of the Preferred Provider Agreement. (Rec. Doc. 11-2). In their omnibus opposition, Plaintiffs allege two different breaches of the contract. First, Plaintiffs' assert that Dentemax breached its responsibility to "market its program to groups and individuals with the intent of obtaining Participants who may become patients of the Provider." *Id.* Second, Plaintiffs contend Dentemax violated its contractual obligation that "[a]ll notices, including but not limited to change of address and change of license status shall be submitted in writing and delivered either personally or by U.S. Mail postage." *Id.*

The Court finds Plaintiffs first breach of contract claim is not supported by the facts alleged in their complaint. Plaintiffs merely allege that Dentemax marketed the program to Ameritas. Nowhere do Plaintiffs state facts alleging Dentemax failed to market the program to other groups and individuals. *Id.*

The Court further finds Plaintiffs' second claim is not supported by the terms of the contract. The relevant provision states, "[a]ll notices, including but not limited to change of address and change of license status shall be submitted in writing and delivered either personally or by U.S. Mail postage prepaid to the address below or any new address supplied by the other party." (Rec. Doc. 11-2). The provision merely details how notices are to be delivered. It does not set forth an affirmative obligation to deliver notices. The obligation to give notice arises from the language of 40:2203.1, and it is there that the remedies for failing in that obligation are found, not in breach of contract.

Accordingly, Plaintiffs have failed to state a claim for breach of contract upon which relief can be granted.

**C. Plaintiffs' Claim for Declaratory and Injunctive Relief**

Plaintiffs' have stated a claim for declaratory and injunctive relief for the same reasons elucidated in Part II.C. *supra*.

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Ameritas's *Motion to Dismiss* **(Rec. Doc. 8)** is **GRANTED** as regards Plaintiffs' claims for damages under La. R.S. 40:2203.1(G) and **DENIED** as regards Plaintiffs' claims for compensation and declaratory relief.

**IT IS FURTHER ORDERED** that Defendant Dentemax's *Motion to Dismiss* **(Rec. Doc. 11)** is hereby **GRANTED** as regards Plaintiffs' claims for breach of contract and **DENIED** as regards Plaintiffs' claims for damages under La. R.S. 40:2203.1(G) and declaratory relief.

New Orleans, Louisiana this 26th day of November, 2019.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE